Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7944 | **DATE** | 4/6/2004 |
| **CASE TITLE** | Young vs. Bass, et. al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status hearing held. For the reasons stated in the attached memorandum opinion and order, defendants' Budz and Glotzs' motion for summary judgment is granted. Defendants Bass, Bukowski and Monahan are voluntarily dismissed. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | APR 7 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 60 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| MF | courtroom deputy's initials | 2004 APR -6 PM 2:55 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED

APR - 7 2004

| | |
|---|---|
| RICKY YOUNG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No: 01 C 7944 |
| ) | |
| MARY BASS, JUDY BUKOWSKI, ) | Judge John W. Darrah |
| THOMAS MONAHAN, TIMOTHY BUDZ, ) | |
| ROBERT GLOTZ, SYMON HOPSON, ) | |
| EDWARD SMITH, RAYMOND WOOD, ) | |
| TRAVIS HEINZE, and ) | |
| LIBERTY HEALTHCARE CORPORATION, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ricky Young, filed suit against Mary Bass, Judy Bukowski, Thomas Monahan, Timothy Budz, Robert Glotz, Symon Hopson, Edward Smith, Raymond Wood, Travis Heinze, and Liberty Healthcare Corporation. Plaintiff alleges that he was denied his right to freely exercise his religion, in violation of 42 U.S.C. § 1983. Presently before the Court is the Motion for Summary Judgment of Defendants Bass, Bukowski, Monahan, Budz, Glotz, and Hopson. For the following reasons, the motion is granted.

## LEGAL STANDARD

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims

60

or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## **BACKGROUND**

The undisputed facts, for the purposes of this motion, taken from the parties' Local Rule 56.1(a) & (b) statements of material facts (referred to herein as "Pl.'s 56.1" and "Def's 56.1") and exhibits, are as follows.

Plaintiff, who is indigent, has been in the custody of the Department's Sexually Violent Persons Unit at either the Sheridan or Joliet Treatment and Detention Facilities in Illinois. He

had been under the care of the Department since October 2000; and his formal commitment began on April 25, 2002. Pl.'s 56.1 ¶ 1, Def.'s 56.1 ¶ 1. Until April 2002, Plaintiff was a civil detainee, which means that he was incarcerated based upon a probable cause finding under the Sexually Violent Persons Act. After April 25, 2002, Plaintiff was civilly committed under the Sexually Violent Persons Act. Def.'s Ex. E, Budz Dep. at 15. Plaintiff follows the Muslim faith, and he has affiliated himself with the Moorish Science Temple of America. Def.'s 56.1 ¶ 2.

Budz is the Facility Director of the Illinois Sexually Violent Persons Treatment and Detention Facility in Joliet, Illinois. He has held that position since January 4, 1999, and is responsible for the overall operations of the site. These responsibilities include the Program's security, the treatment in the Program, the healthcare, the business office, and all of the Facility's operations and engineering. Def.'s 56.1 ¶ 10. As Facility Director, Budz also recommends and formulates new policies and facilitates them through the Department's approval process, as well as ensuring enforcement of policies. Budz helps to revise the Department's Resident Handbook, which governs the residents of the Joliet Facility. He has the authority to change practices within the Facility that are not program directives that the Secretary of the Department formalizes into policy. Def.'s 56.1 ¶ 11.

Glotz was employed as the Security Director of the Joliet Facility. Def.'s 56.1 ¶ 12. He helped to formulate the policy, and his staff carries out the policy. Def's 56.1 ¶ 13.

Hopson is employed by the Facility as a security supervisor, in the position of Executive II. He began working for the Department in November 2000 as an internal investigator, and he was promoted to the position of Executive II in September 2001. Def.'s 56.1 ¶ 14. Hopson's duties as an Executive II are to supervise security matters, which cover the safety of the inmates,

3

the employees, and the building. Def.'s 56.1 ¶ 15. He is also responsible for making sure the policies are enforced, and he makes suggestions for policy changes. Def.'s 56.1 ¶ 16. However, complaints of discrimination do not fall within Hopson's duties. Hopson has no involvement in the food content or its service at the Facility, as well. Def.'s 56.1 ¶ 17.

Muslims are not allowed to eat or otherwise consume any product made from a pig. Def.'s 56.1 ¶ 50. Moreover, a Muslim has a duty of diligence to make inquiry if he believes that food contains pork or a pork by-product. That duty does not extend to milk because it does not include pork by-products. Def.'s 56.1 ¶ 52. Plaintiff never consumed any of the items he contends contained pork; and there would be other food items present, such as roast beef, baked potatoes, and salad. Typically, these extra items would be enough food to eat. Def's 56.1 ¶¶ 50-51.

Food service at the Joliet Facility is contracted through the Aramark Corporation. Oliver Hassett is the Food Service Director of Aramark. Def.'s 56.1 ¶ 54. Budz approved the contract with Aramark and approved the meals served at the Joliet Facility. Def.'s 56.1 ¶ 55. Aramark does not use pork or pork by-products in any of its meals. Def.'s 56.1 ¶ 56.

Once a year, all Muslims take part in Ramadan, which involves fasting from sunup until sundown for thirty days. Def.'s 56.1 ¶ 44. Muslims are encouraged to eat before dawn and must break their fast on time at sundown; however, eating before dawn is not a religious requirement. Def.'s 56.1 ¶ 47. The Department makes accommodations for the Muslim residents at the Joliet Facility who are observing Ramadan. Those residents get a sack breakfast before sunrise and after sunset, and, are allowed a meal with double portions to make up for the missed lunch meal. Def.'s 56.1 ¶ 45; Pl.'s 56.1 ¶ 15. Typically, Plaintiff receives breakfast before sunrise during

Ramadan while at the Sheridan Facility; and if he receives his breakfast after sunrise at the Joliet Facility, Plaintiff would not eat those meals. Def.'s 56.1 ¶ 46. However, during the 2001 Ramadan period, the Department did not know when Ramadan started; and Plaintiff was prevented from fasting properly for two days. Pl.'s Resp. to Def.'s 56.1 ¶ 45, Pl. Ex. 1, Pl.'s Dep. at 19-20.

The Islamamic religion does not mandate the portions of food that an observer of Ramadan should eat, but the spirit of fasting seems to encourage that observer's reduce their intake of food. Def.'s 56.1 ¶ 49. When Plaintiff did not participate in Ramadan, one meal a day sustained Plaintiff adequately; and Plaintiff was not very concerned that he was not getting enough to eat during Ramadan. Rather, Plaintiff was more concerned with the principle that the other detainees were receiving two food trays, one each for lunch and dinner, while Plaintiff only received one tray during Ramadan. Def.'s 56.1 ¶ 48.

Plaintiff used to own a Koran but gave it away because he thought he was going to be released. Def.'s 56.1 ¶ 22; Pl.'s Resp. to Def.'s 56.1 ¶ 22. The Joliet Facility has a library, but Plaintiff has never visited that library. It is thought that the library contains a copy of the bible and the Koran, but it does not contain the Circle 7 Moorish version of the Koran. Def.'s 56.1 ¶ 23; Pl.'s Resp. to Def.'s 56.1 ¶ 23.

Defendants did not provide Plaintiff with a prayer rug, a Fez, a Koran, or any other religious materials. The Department does not provide or sell religious items to the residents at the Facility. Neither the Joliet Facility nor the State of Illinois provides or sells religious items to the residents. Many factors are considered in using general revenue funds, such as the State's obligation to meet the basic and rehabilitative needs of the residents at the Joliet Facility. Def.'s

56.1 ¶ 24.

Specifically, religious items, such as Fezzes, Kufis, and prayer rugs, are not available in the commissary at the Facility nor are they provided by the Department. Pl.'s 56.1 ¶ 6. The commissary is available to Facility residents so that they can purchase food products and some office supplies both within the Facility and from an outside entity. Pl.'s 56.1 ¶ 10. The Facility would not object to selling religious items, but the commissary could not provide every possible item because of its limited space. Def.'s Resp. to Pl.'s 56.1 ¶ 10; Def. Ex. F., Budz Dep. at 31-32. Budz and Glotz both told Plaintiff he would have to buy his own religious materials, but Plaintiff had no money to purchase these items. Pl.'s 56.1 ¶ 7. It was expected that detainees would buy religious items from his or her own trust fund. Pl.'s 56.1 ¶ 11.

However, a resident can get clothing and religious items through different sources. Residents may purchase their own religious items or obtain them through donation. The Department employees would also allow religious items into the Department when they came in through the mail or UPS. Def.'s 56.1 ¶ 26.

Volunteers are allowed to come to the Facility and dispense religious materials without any restriction on the religion. No one at the Facility has ever kept a religious leader from visiting a resident, but the Facility does not provide a phone book to residents to contact religious leaders. Pl.'s Resp. to Def's 56.1 ¶ 31; Def.'s 56.1 ¶ 31. Plaintiff never made a request to put an Imam, a Muslim religious leader, on his visitor list; and he has never asked any other religious leaders about contacting an Imam, though he has written to at least one Imam. Def.'s 56.1 ¶¶ 30, 32. Plaintiff has spoken to some Security Therapy Aides at the Facility whose father is an Imam. He never asked them for a phone number to contact this Imam. Def.'s 56.1 ¶ 33. Plaintiff,

6

though, did speak with a doctor at the Facility who agreed to answer his questions about Islam. Def.'s Resp. to Pl.'s 56.1 ¶ 9. No Imam has ever visited with Plaintiff. Pl.'s 56.1 ¶ 14.

Plaintiff wears a skull cap or stocking cap when praying and often times uses a baseball cap to cover his head. Under traditional Orthodox Islamic teachings, this practice would normally suffice, although Plaintiff has learned that he is required to keep his head covered at all times. Def.'s 56.1 ¶ 38; Pl.'s Resp. to Def.'s 56.1 ¶¶ 6, 38. The Department, though, does not allow the residents at the Joliet Facility to wear hats in common areas, such as the dietary area, unless they have permission. This policy has existed since the Program began in 1996. Def.'s 56.1 ¶ 39. This policy exists for security reasons because residents could hide items in a hat or a hat could signify a threat group, which could be divisive and cause disturbances to the common areas. Def.'s 56.1 ¶ 40.

On one occasion, Hopkins asked Plaintiff to remove his hat before going into the dietary area. Plaintiff said that he was wearing the hat for religious reasons; and Hopson would have let him continue wearing the hat that day based on this explanation, but Plaintiff would need to have a religious leader write a letter explaining that Plaintiff could wear a hat. Plaintiff refused this request and left the dietary area. Def.'s 56.1 ¶ 41; Pl.'s Ex. 1, Pl.'s Dep. at 51-52. Plaintiff told Glotz that he did not have a Kufi, an Islamic head covering; but he was getting one. Glotz asked Plaintiff if he needed help getting a Kufi, but Plaintiff refused. Glotz then allowed Plaintiff to wear his hat into the dietary area. Def.'s 56.1 ¶ 42. Glotz subsequently made a specific order allowing Plaintiff to wear his hat in the common areas of the Joliet Facility because Plaintiff was wearing a baseball cap instead of a Kufi. Def.'s 56.1 ¶ 43.

Budz knew Plaintiff followed Islam, and the Muslims follow the Koran, observe

7

Ramadan, and cannot eat pork or pork by-products. Budz was also aware that Plaintiff complained to someone at the Facility, Dr. Edward Smith, about his meals. Budz was also aware that Plaintiff could not visit with an Imam. Pl.'s 56.1 ¶ 15; Def.'s Resp. to Pl.'s 56.1 ¶ 15.

## ANALYSIS

Plaintiff initially brought claims against Defendants Bass, Bukowski, Monahan, Budz, Glotz and Hopson. Plaintiff, after reviewing the applicable law and conducting discovery, has voluntarily dismissed Defendants Bass, Bukowski, and Monahan from the case.

As to the remaining Defendants -- Butz, Glotz, and Hopson -- Plaintiff contends that his right to freely exercise his religion, Islam, has been impermissibly burdened in four ways. First, Plaintiff contends that Defendants did not provide Plaintiff with a diet that met the requirements of Islam. Second, Plaintiff asserts that Defendants failed to provide any means for Plaintiff to obtain religious materials. Third, Plaintiff claims that he was denied access in seeing an Imam. Finally, Plaintiff argues that Defendants did not allow Plaintiff to keep his head covered, as mandated by his religion.

Pretrial detainees and other persons who have been involuntarily committed "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). However, government officials may still place certain restrictions on the rights of pretrial detainees because it has legitimate interests in managing the facility where an individual is detained. As long as these measures are reasonably related to the effective management of the confinement facility, they are not considered punishment for a crime the detainee is suspected of committing. *Rapier v. Harris*, 172 F.3d 999, 1002-03 (7th Cir. 1999) (*Rapier*).

8

In determining whether a particular measure is reasonably related to the function of pretrial confinement, courts are required to give deference to the professional expertise of the corrections officials. Unless substantial evidence exists in the record showing the officials have exaggerated their response in considering the management of the confinement facility, courts should defer to the confinement officials' expert judgments. *Rapier*, 172 F.3d at 1003.

Pretrial detainees do not lose their first amendment rights to freely exercise religion just because they are incarcerated. *See Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991) (*Al-Alamin*). Confinement facility authorities are required to make reasonable accommodations to an inmate's or detainee's religious desires. *Sasnet v. Litscher*, 197 F.3d 290, 292 (7th Cir. 1999). However, a detainee's free exercise of his "religious beliefs does not depend upon his ability to pursue each and every aspect of his religion." *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996).

Plaintiff first contends that he received a diet that did not meet the requirements of Islam. Specifically, Plaintiff argues that he was given pork sausages on at least three separate occasions; and he was given white bread and Jell-O, which may have contained pork by-products. Plaintiff further asserts that on eight or nine occasions during two Ramadan periods, the meals he received were improper because they either contained pork, were not served at the proper time, or his dinner was not a double meal, which should have additionally included Plaintiff's lunch meal.

As to his first argument, Plaintiff has not demonstrated that a genuine issue of material fact exists regarding his claim that he was served pork or pork by-products. The meals at the Joliet Facility were provided by Aramark. It is undisputed that these meals did not contain pork

or pork by-products. Plaintiff has failed to produce any affidavits, depositions, answers to interrogatories, or admissions to the contrary, and Plaintiff's subjective belief that he was served pork fails to create a genuine issue of material fact. *Beer Capitol Distrib., Inc. v. Guinness Bass Import Co.*, 290 F.3d 877, 880 (7th Cir. 2002).

As to his second argument, as discussed above, it is undisputed that Plaintiff did not receive any meals containing pork or pork by-products. It is also undisputed that Plaintiff, during the 2001 Ramadan, only was prevented from properly fasting for two days. Significantly, Plaintiff has not produced any affidavits, depositions, answers to interrogatories, or admissions alleging that Defendants routinely prevented Plaintiff from properly fasting by serving his meals at the wrong time during Ramadan. *See Rapier*, 172 F.3d at 1006 n.4. Therefore, this incident presents a *de minimis* burden on Plaintiff's free exercise of his religion and fails to rise to a constitutional dimension. *See Rapier*, 172 F.3d at 1006 n.4.

Of the remaining six or seven instances that Plaintiff was not served proper meals during Ramadan, Plaintiff contends that the dinner he received was not a double meal, which should have additionally included Plaintiff's lunch meal. "Inmates also have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *McElyea v. Babbit*, 833 F.2d 196, 198 (9th Cir. 1987).

However, Plaintiff does not dispute that one meal a day provided Plaintiff with food sufficient to sustain him in good health while he was not participating in Ramadan. Plaintiff also does not dispute that he was more concerned with the principle that the other detainees were receiving two food trays, one each for lunch and dinner, while Plaintiff only received one tray during Ramadan. Plaintiff does not further dispute that Islam does not mandate the portions of

10

food that an observer of Ramadan should eat, and the spirit of fasting does seems to encourage reducing the intake of food. Thus, Plaintiff's alleged injury is not that he was denied the right to be provided with food sufficient to sustain him in good health and that satisfies the dietary laws of Islam. Plaintiff complains that other detainees were receiving more food. This complaint does not present a constitutional injury; and, accordingly, Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to whether he received any meals that did not meet the requirements of Islam.

Plaintiff next asserts that Defendants failed to provide any means for Plaintiff to obtain religious materials. Plaintiff argues that Defendants should have provided prayer rugs, Fezzes, a Circle 7 Koran of the Moorish Science Temple, and other religious materials at either no cost or through the commissary so that indigent detainees, such as Plaintiff, can purchase religious materials at low costs.

Although confinement facility authorities are required to make reasonable accommodations to suit a detainee's religious desires, these authorities are not required to supply every detainee with religious materials at no cost. *Cf. Allen v. Tombs*, 827 F.3d 563, 569 (9th Cir. 1987) (holding that prison administrators are not required to provide each inmate with the spiritual counselor of his choice). This is because confinement facilities, like the Joliet Facility, must consider many factors in using general revenue funds, such as the State's obligation to meet the basic and rehabilitative needs of the residents at the Joliet Facility. *See Al-Alamin*, 926 F.2d at 686. Providing every possible religious item desired by a detainee at no cost, in the professional judgment of the Joliet Facility officials, would not be economically feasible and would not be feasible based on the space available at the Joliet Facility. It would be practically

11

impossible to stock the commissary with every religious item desired by the detainees.

Plaintiff also argues that the Joliet Facility commissary could sell only religious items small in size. However, if the Joliet Facility only sold certain small religious items, it would be required to pick and choose between religious items and raise issues and complaints regarding the justification of the selection of some religious items and rejection of others. *See Sasnett*, 197 F.3d at 292-93. Therefore, in the professional judgment of the Joliet Facility officials, it would be better not to sell any religious items in the commissary.

The Joliet Facility does permit detainees access to religious materials through other means. Detainees may receive items through donations, and Joliet Facility officials permit religious items into the Facility when they come in through the mail or UPS. Detainees may also purchase religious items by using money in their trust funds. The Joliet Facility provides religious texts, including the Koran, in its library, as well. Therefore, Plaintiff and other detainees are provided with reasonable accommodations to satisfy their religious desires. No genuine issue of material fact exists demonstrating that Defendants failed to provide Plaintiff reasonable access to religious materials.

Plaintiff also argues that he was denied access to an Imam. Specifically, Plaintiff asserts that he lacks access to a phone book or contact information for contacting an Imam. However, it is undisputed that Plaintiff has previously written to an Imam. It is further undisputed that Plaintiff, despite talking with two security guards whose father is an Imam, never sought the phone number of this Imam. Plaintiff has failed to produce any affidavits, depositions, answers to interrogatories, or admissions to the contrary. Therefore, Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to whether he was denied access to an Imam.

Finally, Plaintiff contends that he was not permitted to wear his hat in the dietary area even though he is required to keep his head covered at all times for religious purposes. Plaintiff specifically claims that on one occasion, Hopkins told Plaintiff that he could not wear his hat in the dietary area unless Plaintiff obtained a letter from a religious leader.

Although hats cannot be worn in common areas because of security concerns, it is undisputed that Hopkins would have permitted Plaintiff to enter the dietary area on this particular occasion with his hat on, even though he did not have a letter from a religious leader. Moreover, it is undisputed that Plaintiff was then allowed by Glotz to enter the dietary area and the remainder of the common areas with his baseball cap. Thus, even if Plaintiff was prevented from wearing a hat on one occasion, this incident is also *de minimis* and does not rise to a constitutional burden on Plaintiff's free exercise of religion. *Rapier*, 172 F.3d at 1006 n.4. Plaintiff has failed to produce any affidavits, depositions, answers to interrogatories, or admissions to the contrary. Therefore, no genuine issue of material fact exists demonstrating that Plaintiff was prevented from wearing a hat for religious reasons.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment by Defendants Budz, Glotz, and Hopson is granted. Defendants Bass, Bukowski, and Monahan are voluntarily dismissed.

Dated: April 6, 2004

JOHN W. DARRAH
United States District Judge

13